

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of | ) |
| | ) DIVISION ONE |
| E.J.L., | ) |
| DOB: 8/24/13, | ) No. 73444-0-I |
| | ) |
| Minor Child. | ) |
| | ) |
| CARRIE LEHNERT, | ) |
| | ) |
| Appellant, | ) UNPUBLISHED OPINION |
| v. | ) |
| | ) |
| STATE OF WASHINGTON, | ) |
| DEPARTMENT OF SOCIAL AND | ) |
| HEALTH SERVICES, | ) |
| | ) |
| Respondent. | ) FILED: February 29, 2016 |
| | ) |

DWYER, J. – Carrie Lehnert appeals from the trial court's order terminating her parental rights to her daughter, E.L. Lehnert asserts that the Department of Social and Health Services (Department) did not prove that she is currently unfit to parent E.L. or that it offered or provided all reasonably available, necessary services, capable of correcting her parental deficiencies within the foreseeable future. Because substantial evidence supports the necessary trial court findings, we affirm.

I

Following a three-day trial in March 2015, the trial court terminated Carrie Lehnert's parental rights to her daughter E.L. The majority of the trial court's findings of fact are unchallenged and therefore verities on appeal. See In re Dependency of J.A.F., 168 Wn. App. 653, 667, 278 P.3d 673 (2012).

Lehnert is the mother of E.L. (born August 24, 2013) and E.L.'s older brother, A.L (born March 20, 2012). The Department removed A.L. from Lehnert's care shortly after birth, primarily because of Lehnert's mental health issues. The dependency petition alleged concerns about Lehnert's obsessive-compulsive disorder (OCD), including the hoarding of garbage, failure to seek prenatal care, and sporadic participation in mental health services. The disposition order required Lehnert to participate in a psychological evaluation, parenting classes, mental health counseling with an emphasis on OCD and hoarding, and medication management.

Lehnert did not participate in any of the court-ordered services. She acknowledged that she was not ready to care for A.L. and voluntarily relinquished her parental rights in November 2013.

On August 26, 2013, two days after her birth, the Department removed E.L. from the hospital and placed her with the caregivers who later adopted A.L.

E.L. has remained in this prospective adoptive home since her removal and has never lived with either parent.[1]

The trial court entered an agreed dependency order as to E.L. on October 22, 2013. Lehnert stipulated that she needed stable housing, mental health counseling, and other services to assist with reunification. The court ordered Lehnert to participate in the same services identified for A.L.'s dependency: a psychological evaluation, parenting classes, mental health counseling with an emphasis on OCD and hoarding, and medication management. The Department also provided Lehnert with contacts for housing assistance. At the time of E.L.'s dependency order, Lehnert's mental health issues remained essentially untreated.

Initially, Lehnert did not engage in any of the court-ordered services. She began mental health counseling with Compass Health in December 2013.

Jane Norberg, Lehnert's therapist at Compass, testified that between December 2013 and May 2014, Lehnert participated in a total of three counseling sessions and cancelled two scheduled sessions. Lehnert's treatment plan included coping techniques for dealing with her depression and OCD. Norberg felt that when Lehnert left Compass in May 2014, she had made "some progress" and had "greater insight" into some of her problems. Norberg estimated that it would be "at least a year or two" before Lehnert could "overcome" her mental

---

[1] The parental rights of E.L.'s father, which the court terminated in December 2014, are not at issue in this appeal.

health issues. Lehnert did not participate in available medication management services.

Lehnert did not begin visiting E.L. until February 2014. Although frequently late, she then participated regularly in twice-weekly supervised visits until the termination trial.

In May 2014, Lehnert transferred from Compass Health to Sunrise Services because it was closer and she intended to schedule more frequent appointments. At Sunrise, Lehnert attended counseling sessions on a relatively regular schedule and participated in cognitive behavioral therapy (CBT) techniques. Lehnert began medication management in January 2015. In March 2015, just before the termination trial, Lehnert attended the first session of a dialectical behavioral therapy (DBT) group

Lehnert also participated in court-ordered parenting services. The Department referred Lehnert for the Incredible Years parenting class in January 2013, during A.L.'s dependency, and again in December 2013, during E.L.'s dependency. In each case, Lehnert failed to participate. The Department referred Lehnert for a third time in August 2014. She successfully completed the class in February 2015.

Lehnert participated in one-on-one parent coaching with Marie Preftes-Arenz from February 2014 through December 2014. The coaching sessions, which usually occurred during Lehnert's visits with E.L., focused on maternal

bonding, infant growth and development, and demonstrating appropriate parenting skills.

Preftes-Arenz testified that, over time, Lehnert demonstrated some improvement in maternal bonding with E.L. and in her ability to meet the basic needs of an infant. Although Lehnert was generally able to learn and apply basic skills in caring for E.L. during the visits, Preftes-Arenz noted that "[t]here were repeated prompts to do the same thing often," including the steps necessary to change diapers and identify appropriate food for a child moving to solid foods.

When the current referral ended in December 2014, Preftes-Arenz felt that no further coaching sessions were necessary because Lehnert had the skills necessary to keep E.L. safe during the twice-weekly supervised visits. But Lehnert continued to struggle with slow response times when addressing E.L.'s needs, requiring Preftes-Arenz's prompts. Lehnert also had difficulty in concluding the visits on time. Preftes-Arenz observed that Lehnert would become distracted while packing her belongings into bags, leaving E.L. "toddling around the visitation location" unsupervised. Lehnert frequently called Preftes-Arenz to "perseverate on something that happened at the visit or my report to the social worker." On one occasion during a visit, Lehnert engaged Preftes-Arenz heatedly about a report they had discussed at length the previous evening. Preftes-Arenz eventually had to direct Lehnert to focus her attention on E.L., who had been wandering around unsupervised.

Preftes-Arenz explained that the ultimate goal of her parent coaching was not just a parent's demonstration of the necessary specific skills, but rather a "generalization of skills, so that a parent . . . can then apply that same knowledge to other aspects of parenting that are similar to that particular instance." At the conclusion of the coaching session, Lehnert was still struggling with certain skills and was unable to apply those skills to the frequent unexpected situations that arise during the full-time, unsupervised care of a young child.

Preftes-Arenz concluded that Lehnert's continuing mental health issues, including her ongoing struggle to respond quickly to E.L.'s needs and her susceptibility to distractions, raised significant safety concerns for E.L. Despite the lengthy one-on-one parent coaching, Preftes-Arenz felt that Lehnert was not yet ready to begin a serious effort at reunification or to keep E.L. safe in an unsupervised setting.

Angie Clow began supervising Lehnert's visits with E.L. in December 2014. On several occasions, Lehnert became distracted near the end of the visit. While preparing to leave, Lehnert would become focused on making sure that she had picked up all her belongings, including checking in rooms that she had not used. In the process, Lehnert lost sight of E.L., and Clow would have to retrieve her. Lehnert's distractions also prevented her from leaving the facility on time.

In the month before the termination trial, Lehnert continued to become frustrated during the visits and would seek guidance from Clow when

encountering difficulties in changing E.L.'s diapers. After Lehnert missed a third visit on February 27, 2015, the visits were suspended until Lehnert obtained a new referral.

The Department referred Lehnert for a psychological evaluation with Dr. Michael O'Leary, a clinical psychologist, beginning in February 2013. After missing several appointments, Lehnert finally attended the testing portion of the evaluation in May 2014. After Lehnert again failed to appear for several appointments, the clinical interview and parent-child observation components of the evaluation were eventually scheduled for August 1, 2014.

Lehnert was released from a two-week jail sentence on the day before the appointment. She informed her social worker, Wyndi Horness, that she was going to keep the appointment, but insisted that E.L. not be present. Lehnert failed to appear for the appointment. At the termination trial, Lehnert explained that she felt unprepared for the parent-child observation after being in jail for two weeks. After so many missed appointments, Dr. O'Leary declined to reschedule the appointment.

Despite Lehnert's failure to appear for the clinical interview and parent-child observation, Dr. O'Leary completed his report using Lehnert's test results and other information from the referral. He diagnosed Lehnert with major depressive disorder and anxiety disorder with obsessive-compulsive symptoms. Dr. O'Leary concluded that Lehnert's "intense self-preoccupation and obsessive characteristics which contribute to disorganization and lack of emotional stability"

posed the primary risk of Lehnert's mental health diagnoses to E.L.'s health and safety.

Dr. O'Leary recommended that Lehnert engage in comprehensive wrap-around psychiatric services, including CBT and DBT components and medication management. Dr. O'Leary's determination that it will "take at least a year, and more likely two to three years, of wrap-around psychiatric services before the mother may become sufficiently independent to have the ability to parent [E.L.]" is also unchallenged on appeal.

Dr. O'Leary acknowledged that Lehnert had been participating in medication management for two months, but described that period as "still kind of in the trial and error stage." Psychiatric medications can take six months to a year to stabilize.

Wyndi Horness testified that Lehnert had made progress in correcting parental deficiencies since A.L.'s dependency began in 2012. She acknowledged that there had been "improvement and more stability" for Lehnert in the six months before the termination trial, but that her concerns about Lehnert's ability to parent E.L. safely had not gone away. Based on her observations, Horness felt that Lehnert's mental health issues continued to prevent her from meeting even her own needs and raised safety concerns about her ability to care for E.L.:

> [S]he really struggles with parenting in a big picture. She can parent and do those things that she has the skills for as long as she has the time to process it and what would be the best direction to

take in that situation. But when it is an immediate need or unexpected, she just is not able to immediately jump on that or process that as quickly as she should, especially around safety concerns that are present for a toddler.

Horness believed that Lehnert was not yet ready for monitored visits and still needed a controlled environment and constant supervision. Lehnert needed to accomplish at least three months of visits with no safety issues before the Department could consider monitored visits.

Lehnert testified at length. The trial court found that she had a good assessment of her abilities and deficiencies. Lehnert also understood at least some of the difficulties that her mental health issues caused in parenting E.L. Lehnert acknowledged that she did not yet have the appropriate housing that would permit her to parent E.L. Initially, she indicated that she was "just kind of looking" into a residence that she located on Craigslist. She later testified that she believed she had located a suitable place to live in Lynnwood.

The trial court determined that the Department had established the statutory requirements and terminated Lehnert's parental rights. The court determined that the near future for E.L., who was 19 months old at the time of trial, was three months. The court found that although Lehnert had made some progress, her mental health issues, including obsessive thought processes and preoccupation, overthinking, delayed decision-making, and difficulties in dealing with the unexpected situations that arise during parenting a young child,

prevented Lehnert from adequately responding to E.L.'s basic needs in the foreseeable future. Lehnert appeals.

II

Because parents have a fundamental right to the care and custody of their children, "a trial court asked to interfere with that right should employ great care." In re Welfare of M.R.H., 145 Wn. App. 10, 23, 188 P.3d 510 (2008); see also Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Before terminating parental rights, Washington courts must follow a two-step process. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). First, the Department must prove the six termination factors specified in RCW 13.34.180(1). A.B., 168 Wn.2d at 911-12. In addition, due process requires the trial court to find that the parent is currently unfit to parent the child. A.B., 168 Wn.2d at 911. The first step "focuses on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence." A.B., 168 Wn.2d at 911 (footnote omitted). If the Department satisfies the first step, the court then determines, by a preponderance of the evidence, if termination is in the child's best interests. RCW 13.34.190(1)(b).

Where, as here, the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the court's findings of fact and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the

declared premise." In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011). Clear, cogent, and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable. In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995). Because the trial judge "has the advantage of having the witnesses before him or her, . . . deference to the findings is of particular importance in deprivation proceedings." In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

Lehnert contends that the evidence was insufficient to support the trial court's finding that she is currently unfit to parent E.L. She maintains that by the time of the termination trial, the evidence demonstrated that she was making progress and that the need for parenting prompts and assistance during visits was decreasing. Lehnert argues that, viewed in light of her progress, the evidence of her mental health issues, obsessive thought processes, delayed responses during parenting tasks, and chronic tardiness established nothing more than the mere possibility of a safety risk to E.L., and was therefore insufficient to establish current parental unfitness.

"[M]ental illness is not, in and of itself, proof that a parent is unfit or incapable." In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005). Rather, to prove current unfitness, the Department must establish by clear, cogent, and convincing evidence that "parenting deficiencies prevent the parent from providing the child with 'basic nurture, health, or safety.'" In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2014) (quoting RCW

-11-

13.34.020). In determining the likelihood that parental deficiencies will be remedied in the near future, the trial court may also consider whether there is a "[p]sychological incapacity or mental deficiency of the parent that is so severe and chronic as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child." RCW 13.34.180(1)(e)(ii).

The evidence was undisputed that Lehnert suffers from significant mental health issues that affect her ability to parent E.L. The trial court found that Lehnert's OCD and obsessive thought processes caused her to overthink "even the most basic decisions," resulting in slow response times, indecisiveness, and distractions, and interfering with her ability to complete goals and tasks and to make informed decisions about E.L.'s "health, medication, education, and safety needs." These findings are unchallenged on appeal.

Dr. O'Leary diagnosed Lehnert with anxiety disorder with obsessive-compulsive symptoms and major depressive disorder. He noted that Lehnert had struggled with OCD since adolescence and that its symptoms had interfered with her social competence and ability to parent for more than 10 years. According to Dr. O'Leary, Lehnert's "intense self-preoccupation and obsessive characteristics" contributed to her disorganization and lack of emotional stability and created the primary risks to E.L. resulting from her mental health issues. Dr. O'Leary explained that Lehnert's chronic OCD stress levels and frustrations

posed particular challenges for dealing with the frequent novel situations that occur while caring for a young child:

> Decision-making, doesn't go according to plan, the lack of self-confidence, the lack of decisiveness that is often necessary, especially in fast-moving or critical situations, stopping to think if this is the right decision rather than just taking action.

A parent's indecisiveness when faced with potential hazards or distraction raises "critical" safety concerns for a child.

Lehnert argues that Dr. O'Leary's testimony must be discounted because his evaluation occurred in August 2014, without her participation in the clinical interview and parent-child observation components. But the trial court also had before it ample evidence of Lehnert's parenting abilities during the months just before the termination trial. That evidence was consistent with Dr. O'Leary's evaluation.

The trial court found that, although Lehnert had made some progress, the improvement in her ability to parent E.L. outside the limited and highly controlled environment of supervised visits was minimal. Both Lehnert's parenting coach and the visit supervisor testified that Lehnert's chronic tardiness, overthinking, perseverating, delayed responses to parenting situations, and obsession with personal belongings persisted throughout the three months preceding the termination trial. Even in February 2015, Lehnert's mental health issues continued to distract her from childcare and allowed E.L. to wander away without supervision.

-13-

Marie Preftes-Arenz, Lehnert's parent coach, acknowledged that Lehnert had demonstrated an ability to keep E.L. safe during the supervised visits, although she still needed repeated prompts. But even after nearly a year of one-on-one coaching, Preftes-Arenz found that Lehnert had not yet acquired the skills to keep E.L. safe in an unsupervised setting and "still needed another party to just observe and make sure that [E.L.] was safe." Moreover, Lehnert was unable to "generalize" those skills she had learned by applying them to the unanticipated situations that arise during full-time childcare. Preftes-Arenz concluded that Lehnert was not yet ready even to begin a serious attempt at reunification.

The trial court observed some of Lehnert's mental health issues during the course of her trial testimony. The court found that Lehnert was overthinking issues when confronted with unanticipated questions during her trial testimony. In addition, Lehnert was frequently late to court and returned late from almost all court breaks.

In summary, although Lehnert had also demonstrated progress, the evidence established that her mental health issues, including OCD, chronic tardiness, susceptibility to distractions, indecisiveness and delayed responses, and inability to respond to novel situations arising during childcare, directly impaired her ability to respond to E.L.'s basic needs. The identified deficiencies clearly involved more than mere "subtle safety risks" to E.L. A.B., 181 Wn. App. at 64. The evidence was sufficient to permit the trier of fact to find it highly probable that Lehnert's parental deficiencies created a serious risk to E.L.'s

-14-

health and safety and prevented her from meeting E.L.'s basic needs within the foreseeable future. Substantial evidence supported the trial court's finding of current parental unfitness.

III

Under RCW 13.34.180(1)(d), the Department must prove that it offered or provided all court-ordered services and "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." The services "must be tailored to each [parent's] needs." In re Dep. of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). Lehnert contends that individual transportation to the psychological evaluation and an updated psychological evaluation were necessary services that the Department should have provided to comply with this termination factor.

Lehnert testified that she did not drive and had long relied primarily on the bus to participate in her services. For the first time on appeal, she now contends that because her OCD was directly related to her chronic tardiness and failure to consistently keep appointments, the Department should have provided her with individual transportation to her scheduled clinical interview and parent-child observation with Dr. O'Leary on August 1, 2014. She relies primarily on her testimony about experiencing "anxiety" while riding the bus and the fact she successfully completed the Incredible Years parenting class, which included transportation.

Because Lehnert did not raise the issue of bus transportation, either in opening or closing statements or in her own testimony, the trial court had no occasion to consider the necessity of individual transportation or enter relevant findings. Nor does the record contain evidence that Lehnert's reliance on bus transportation presented a meaningful barrier to her participation in necessary services. Lehnert's testimony about "anxiety" while riding the bus did not involve a complaint, but rather the techniques she was applying to deal with anxiety in all situations. Lehnert explained that she occasionally felt anxious when she was on a bus with many other people, but she then added, "that's pretty much easily worked through" and "I've found ways to deal with it through counseling and classes."

Finally, the record does not support Lehnert's claim that the lack of individual transportation resulted in a late and incomplete psychological evaluation. Lehnert had already missed multiple scheduled appointments before she agreed to the August 1, 2014 appointment. On the day before the appointment, Lehnert told her social worker that she would be attending the clinical interview, but she did not permit the social worker to transport E.L. for the parent-child observation component. Consequently, even if Lehnert had appeared for the August 1 appointment, the parent-child observation component would not have been completed.

The record fails to demonstrate that individual transportation was a necessary service.

-16-

IV

Lehnert also challenges the trial court's finding that an updated psychological evaluation was not a necessary service. She claims that Dr. O'Leary's evaluation, which was prepared about seven months before the termination trial, was incomplete because it lacked the clinical interview and parent-child observation components. She further argues that an updated evaluation was necessary to provide the trial court with updated information about her current parenting abilities, deficiencies, and prognosis.

Although Dr. O'Leary acknowledged that it would have been preferable to include the clinical interview and parent-child observation components as part of Lehnert's psychological evaluation, he testified that he had sufficient information to provide a meaningful assessment, including the testing portion of Lehnert's evaluation, two complete psychosocial summaries, and other materials from the Department, including visit supervision notes. Dr. O'Leary is an experienced psychologist who has conducted more than 1,000 parental evaluations. The trial court's acceptance of his testimony involves a credibility assessment that this court cannot review. See In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009).

Moreover, the trial court also had before it updated information about Lehnert's efforts after Dr. O'Leary's evaluation, including Lehnert's extensive testimony. Lehnert's social worker, parenting coach, visitation supervisor, and therapist testified in detail about her current parenting abilities, deficiencies, and

prognosis. Dr. O'Leary's opinion that Lehnert would need at least a year to remedy parental deficiencies, but more likely two to three years, is unchallenged on appeal. In January 2015, at a dependency review hearing, the court denied Lehnert's request for an updated evaluation because she had failed to demonstrate sufficient progress.

Substantial evidence supports the trial court's finding that an updated psychological evaluation was not a necessary service and that the Department offered or provided Lehnert with all necessary services capable of correcting parental deficiencies within the foreseeable future.

The order terminating Lehnert's parental rights is affirmed.

We concur:

Cox, J.

Dwyer, J.

Becker, J.